IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| LOREE PERRY, Individually and On Behalf of All Others Similarly Situated | | PLAINTIFFS |
| v. | NO. 6:23-CV-00489 | |
| SHEIKHANI GROUP D/B/A VAPE CITY and ALI SHEIKHANI | | DEFENDANTS |

## COMPLAINT

COMES NOW Plaintiff, Loree Perry, Individually and on Behalf of all Others Similarly Situated, by and through counsel, Wallace, Martin, Duke & Russell, PLLC, and for Plaintiff's Complaint, Plaintiff alleges the following upon information and belief, except for the allegations pertaining specifically to the individual Plaintiff, which are based on personal knowledge:

## THE PARTIES, CLASS ALLEGATIONS, AND JURISDICTION

### THE PARTIES

1. Plaintiff is a person is a resident of the State of Texas who purchased D8 vape pens ("the Product") from Sheikhani Group d/b/a Vape City ("the Defendant").

2. Each Plaintiff seeks to represent the Class defined below.

3. The Corporate Defendant, Sheikhani Group d/b/a Vape City ("Vape City") is a domestic Texas corporation with numerous locations throughout the State of Texas including within the jurisdiction of this Court in Tyler, Texas, with its headquarters in Houston, Texas. The CEO of Vape City is Defendant Ali

1

Sheikhani, who is believed to be a resident of the State of Texas who has personally and expressly decided to sell illegal D8 products in the State of Texas.

4. Defendants are one of the largest D8 THC vape pen sellers in the State of Texas.

5. The Product is sold at over 150 of Defendants' retail locations including in the city of Tyler, Texas.

6. The Products are sold individually by each Defendant, and each Defendant has continuously sold illegal products for over a year, according to product testing results.

7. Plaintiff Perry bought the following eight (8) products from Defendants:

 a. Company, MELLOW MONKEY, brand name Knockout, with a strain name of Pineapple Kush;

 b. Company, EXTRAX, with a strain name of Blueberry Kush;

 c. Company, EXTRAX, with a strain name of Fire OG;

 d. Company, EXTRAX, with a strain name of Pie Hoe;

 e. Company, URB, with a strain name of Lemonade Kush;

 f. Company, CRAVE, brand name White Rhino, with a strain name of Chill Blend;

 g. Company, Packwoods, with a strain name of Sundae Driver; and,

 h. Company, Packwoods, with a strain name of Melonade.

8. The Products were purchased in 2023 for each cause of action alleged, at the VAPE CITY store located at 3849 State Hwy 64 West, Tyler, TX, 75704, all within the State of Texas, on or about July 20, 2023.

9. Plaintiff purchased these Products anticipating and expecting them to be legal.

10. Plaintiff wanted to buy a legal D8 THC product but was unable to do so due to each Defendant's fraud and deception.

11. Plaintiff wanted a legal amount of hemp-dervied Delta 9 Tetrahydrocannabinol (hereinafter "hemp derived D9 THC"). Plaintiff did not purchase a product containing a legal amount of Delta 9 Tetrahydrocannabinol because of each Defendant's deception.

12. Unbeknownst to Plaintiff, the Vape City sold Plaintiff Products labeled as "D8" that contained an illegal amount of D9 THC and synthetic D9 THC.

13. Plaintiff relied on the representations on the label that the products she bought contained a legal amount or type of Delta 9 Tetrahydrocannabinol.

14. The Plaintiff would not have purchased any of the Products if Plaintiff had known that the representations that the Products purchased legal amount of Delta 9 Tetrahydrocannabinol on the label were false and misleading.

15. Plaintiff chose the Products, over other similar situated products, which were represented similarly, but contained a legal amount and type of Delta 9 Tetrahydrocannabinol.

16. The Products were worthless because the Products did not contain a

legal amount of Delta 9 Tetrahydrocannabinol and contained synthetic D9 THC as well, and who would not have paid any money at all for the Products, absent Defendants' false and misleading statements and omissions.

17. Plaintiff intends to, seeks to, and will, purchase D8 products again, if and when the Plaintiff can do so with the assurance that Product representations that the product contains a legal amount and type of Delta 9 Tetrahydrocannabinol are legal and truthful.

## CLASS ALLEGATIONS

18. Defendants maintain a database that identifies persons who purchase D8 products and the type of D8 products purchased from the corporate Defendant. Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of the following class:

All persons who bought one or more of the same Products purchased by the Plaintiff identified above in the State of Texas who has a receipt or is identified in the Defendants' purchaser database within the appropriate statute of limitations until the date of certification. Excluded from Class are any directors, officers, or employees of Defendants, Plaintiff's counsel, members of their immediate families, and any director, officer, or employee of any entity in which Defendants have a controlling interest, and legal representatives, heirs, successors, or assigns of any such persons.

19. Common questions of law or fact predominate and include whether Defendants' representations were and are misleading in violation of Texas and

4

federal law and if the Plaintiffs as well as the class members are entitled to damages or rescission. In this case, the key issues include:

      a.    Did the Products purchased by the Plaintiff and Class contain synthetic D9 THC?

      b.    Did the Products purchased by the Plaintiff and Class contain more then .3 % hemp-derived D9 THC by weight?

20. Plaintiff's claims and basis for relief are typical to other members because all engaged in an illegal transaction unknowingly and are entitled to rescind the transaction.

21. Plaintiff is an adequate representative because Plaintiff's interests do not conflict with other members. Plaintiff's counsel is competent to represent the Class, since they have previously served as Lead Counsel in certified class actions on multiple occasions.

22. No individual inquiry is necessary since the focus is only on Defendants' practices and the class is definable and ascertainable by virtue of Defendants' business records and receipts.

23. Individual actions would risk inconsistent results and would also be both repetitive and impractical to justify, as the claims are modest relative to the scope of the harm. A Class action is superior because the relatively small amount of money at issue for each purchase. Indeed, public policy does not encourage the sale of illegal drugs.

24. Plaintiff's counsel is competent and experienced in complex class action

litigation and intends to protect class members' interests adequately and fairly.

25. Class members number in the thousands and joinder would be impossible.

26. As allowed by Rule 23(b)(2), Plaintiff seeks class-wide injunctive and equitable relief because the Defendants' practices continue, despite notice, and certain equitable remedies are sought.

## JURISDICTION

27. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2) and 28 USC 1331, as well as 28 USC 1367.

28. The aggregate amount in controversy exceeds $50 million, including any statutory damages, exclusive of interest and costs.

29. Plaintiff purchased the aforementioned Products on July 20, 2023, from Vape City, located at 3849 State Hwy. 64 West, Tyler, TX 75704.

30. Ali Sheikhani, is believed to be a resident and citizen of the State of Texas; and, is Vape City's CEO, therefore, venue is proper under 28 USC 1391(b).

31. Venue is in this district because Defendants sell their product in this district and the actions giving rise to the claims occurred within this district.

## GENERAL ALLEGATIONS OF FACT

32. Plaintiff is a resident and citizen of the State of Texas. Vape City markets and sells D8 THC Vape Pens, the Products, in this District, which are warranted, on the label and through certificates of analysis, as compliant with the Hemp Farming Act of 2018, meaning that these products are to contain no more

6

than 0.3% hemp-derived D9 THC by weight. This representation is false because the Products contained more than 0.3% hemp-derived D9 THC by weight and synthetic DNA.

33. Defendants intend for Plaintiff and the Class to rely upon these false representations because Defendants also warrant and represent through their website:

> A Certificate of Analysis or "COA" is a document from an accredited laboratory that shows the number of various cannabinoids in a product.
>
> Our company sends every batch of every product made to a third (3rd) party laboratory for testing to protect our customers. Our COAs also certify that our products have as much CBD and other cannabinoids as we advertise.
>
> Once you receive your product there should be a QR code on the label that you can scan and you will be taken to a web page with the product's COA.

34. The representations made by Defendants are misleading because the product label and the COA's give consumers warrant that each Product contains a legal amount of D9 THC ingredients even though it does not.

35. D9 THC is the psychoactive component of what is commonly known as marijuana.

36. D8 THC is also psychoactive, but D8 THC is hemp derived and is not a controlled substance under federal law. If D8 THC is produced, D9 THC is also produced.

37. Any amount of synthetic D9 THC in a product is illegal. Hemp derived D9 THC can be present in a product so long as the amount does not exceed 0.3% D9

THC by weight. Here, all of the products Plaintiff purchased, including products marketed by Defendants containing an illegal amount of D9 THC.

38. Plaintiff files this suit under the Texas Deceptive Trade Practices Act. Plaintiff seeks redress under the Magnusson Moss Act.

39. Plaintiff has also files suit for negligent misrepresentation, fraud, and unjust enrichment/disgorgement.

40. The Hemp Farming Act of 2018 removed hemp (defined as cannabis with less than 0.3% THC) from Schedule I controlled substances and made it an ordinary agricultural commodity. Its provisions were incorporated into the 2018 United States Farm Bill that became law on December 20, 2018.

41. Then, the interim final rule entitled "Implementation of the Agriculture Improvement Act of 2018" effective on August 21, 2020 (85 Fed. Reg. 51,639) made any product containing more than 0.3% D9 THC illegal.

42. As used in this Complaint, an illegal D8 THC vape means a vape that contains more than 0.3% D9 THC hemp derived THC by weight or synthetic THC.

43. Defendants advertise, "To be considered hemp oil, by law a product cannot contain more than 0.3% THC by weight. If it contains more it is considered marijuana and may not be legal in your state."

44. Studies suggest that CBD is not very reliable or safe. In 2020, the FDA did a study on products that claimed to have a specific amount of CBD and those claimed amounts were compared to the FDA testing results.

45. Of the eight (8) Products purchased, only two (2) of the Products had a

COA, and those were companies, URB and Extrax. These COA's were false.

46. Each of the Products were tested by *Infinite Chemical Analysis*, which were indicated to have a specific amount of THC. The testing also revealed the presence of synthetic D9 THC in each product. The August 3, 2023 testing of the Products showed the following ReTested hemp-derived D9 variance levels:

    a. Company, MELLOW MONKEY, brand name Knockout, with a strain name of Pineapple Kush, ReTest D9 THC 2.09%, with D9% variance of 596.6666667%, above the legal limit;

    b. Company, EXTRAX, with a strain name of Blueberry Kush, ReTest D9 THC 5.33%, with D9% variance of 1676.6666667%, above the legal limit;

    c. Company, EXTRAX, with a strain name of Fire OG, ReTest D9 THC 2.37%, with D9% variance of 690%, above the legal limit;

    d. Company, EXTRAX, with a strain name of Pie Hoe, ReTest D9 THC 3.73%, with D9% variance of 1143.333333%, above the legal limit;

    e. Company, URB, with a strain name of Lemonade Kush, ReTest D9 THC 2.49%, with D9% variance of 730%, above the legal limit;

    f. Company, CRAVE, brand name White Rhino, with a strain name of Chill Blend, ReTest D9 THC 3.26%, with D9% variance of 986.6666667%, above the legal limit;

    g. Company, Packwoods, with a strain name of Sundae Driver, ReTest D9 THC 7.91%, with D9% variance of 2536.6666667%, above the legal

limit; and,

  h.  Company, Packwoods, with a strain name of Melonade, ReTest D9 THC 2.86%, with D9% variance of 853.333333%, above the legal limit.

47. Like here, the *Journal of the American Medical Association* published a letter demonstrating the results of "undercover" purchases of CBD. Of 84 samples tested, THC was detected in 21%. There were other defects in the mislabeled products. Only 30.95% were accurately labeled. Accuracy of labeling depended on product type, with vaporization liquid most frequently mislabeled (87.50%) and oil most frequently labeled accurately (45.0 %). THC was detected (up to 6.43 mg/mL) in 18 of the 84 samples tested (21.43%). But Defendants appear to certify and sell products that contain 1000% of the allowed limit of D9 THC or synthetically derived Delta 9 THC.

48. A *Johns Hopkins* researcher tested CBD products. Testing showed 44 products (59%) had detectible levels of CBD, but the average ratio of THC to CBD was 36-to-1. Only one product had a 1-to-1 ratio, which some research suggests is associated with fewer side effects and improved clinical benefit compared with higher ratios of THC to CBD. The testing indicated the edible cannabis products may have very little CBD.

49. A study published by the National Institute of Health showed that products were mislabeled with 26% containing less CBD than labeled and 43% containing more, indicating a high degree of variability and poor standardization of online products. Notably, the oil-based products were more likely to be accurate

(45% compared to 25% for tincture and 12.5% for vaporization liquid) and had a smaller percentage of deviation. Oil based products also had a higher range of concentration. In addition to CBD mislabeling, THC was detected in 21% of samples. This study also notes that products containing THC could have sufficient enough concentrations to produce intoxication in children.

50. On the issue of D9 THC, Federal Law is clear: it is a felony under the Controlled Substances Act of 1970 ("CSA") to sell a cannabis product that contains more than 0.3% D9 THC by weight or synthetic D9 THC.

51. The DEA has also now characterized D8 THC as a controlled substance as well.

52. Of course, in recent years the United States Department of Justice has largely declined to bring prosecutions under the federal cannabis laws, prompting hundreds of millions of investment dollars and thousands of new customers to flow into the D8 THC commercial hemp industry.

53. But the Justice Department's current policy of non-enforcement does not strike a single word from the U.S. Code or deprive private individuals of their judicially- enforceable rights under federal law. The Department of Justice can no more amend a federal statute than can any individual state, and cannabis remains just as illegal under federal law today as it was when Congress passed the Controlled Substances Act in 1970 (CSA herein).

54. Defendants who market their products as medicinal should be held to reasonable production standards to make certain this "medicine" is legal. Plaintiff

is filing this suit to vindicate federal rights under the Magnusson-Moss Act and state law.

55. Dealing in cannabis that contains more than 0.3% D9 THC by weight or that contains synthetic D9 THC is an illegal activity under state and federal law, and those who engage in a pattern of illegal activity should disgorge the profits and all monies received from the illegal transactions.

56. The sale of the Product with more than 0.3% D9 THC by weight is illegal. Plaintiff purchased the D8 vape pen products, set out hereinabove, that contained more than 0.3% D9 THC by weight directly from Defendants. Defendants falsely expressly or impliedly warranted these products to contain less than 0.3% D9 THC by weight.

57. Reasonable consumers like Plaintiff, and the class members, must and do rely on a company to honestly identify and describe the components, attributes, and features of the Product, relative to itself and other comparable products or alternatives.

58. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendants because it was illegal.

59. Defendants sold Products and at higher prices than it would have in the absence of this misconduct, resulting in additional and illegal profits at the expense of consumers.

60. Had Plaintiff, and proposed class members, known the truth, they would not have bought the Products because it is illegal.

61. Each Product is sold for a premium price compared to other similar products, a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

## COUNT I – TEXAS DECEPTIVE TRADE PRACTICES ACT

62. Plaintiff and the Class incorporates by reference all preceding paragraphs against both Defendants.

63. The Texas Deceptive Trade Practices Act ("DTPA") requires: "(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages." *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex. 1995) (citing Tex. Bus. & Com.Code § 17.50(a)(1)).

64. To qualify as a consumer, "a person must have sought or acquired goods or services by purchase or lease" and "the goods and services purchased or leased must form the basis of the complaint." *Cameron v. Terrell & Garrett,* 618 S.W.2d 535, 539 (Tex. 1981). As such, Plaintiff is a consumer, as is the Class.

65. Plaintiff, and class members, desired to purchase a legal product that contained hemp-derived D8 THC, understood as being comprised of a non-de minimis legal amount of D9 THC, instead the Products contain an illegal amount of hemp derived D9 THC or synthetic D9. Honest testing can, and has, differentiated between hemp-derived Delta 9 THC or synthetic D9.

66. Each Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

67. Defendants misrepresented the Product through statements, omissions, ambiguities, half-truths, and/or actions that the product contained less than 0.3% D9 THC by weight and contained no synthetic D9 THC.

68. Plaintiff relied on the representations.

69. Plaintiff, and class members, would not have purchased the Products, or paid as much for the Products, if the true facts had been known and would therefore not have suffered the same damages.

70. Defendants' use or employment of artifice, unfair, or deceptive acts showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

### COUNT II – BREACHES OF EXPRESS WARRANTY, IMPLIED WARRANTY OF MERCHANTABILITY, AND THE MAGNUSON-MOSS WARRANTY ACT

71. Plaintiff incorporates by reference all preceding paragraphs brings this Count individually against the corporate Defendant.

72. The Product was manufactured, labeled, and sold by Defendants and expressly and impliedly warranted to Plaintiff and the class that the Products were a legal product that contained D8 THC, understood as being comprised of a legal amount of D9 THC, instead of an illegal amount.

73. The Magnuson-Moss Warranty Act provides a cause of action to any consumer "who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation [under the Act], or under a written warranty, implied warranty, or service contract." 15 U.S.C.§ 2310(d)(1).

74. Under 15 U.S.C. § 2301(6)(A), the Act defines a "written warranty" as:

> any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time.

75. A manufacturer's statement is a written warranty under the Act if (1) the statement relates to the nature of the material or workmanship, and (2) affirms or promises defect free performance or guarantees a specified level of performance over a specified period of time. *Id.*

76. Plaintiff read, or relied on, specific marketing statements contained on the label and in the COA that the Products were legal before purchasing the Products on the box and the website. Therefore, Defendants made these representations before Plaintiff made a purchase. Defendants sell D8 THC Vape pens warranted as compliant with the Hemp Farming Act of 2018, meaning that these products contain no more than 0.3% D9 THC by weight. This representation is false. At the time Plaintiff purchased the Products, Defendants also warranted and represented through their website:

> A Certificate of Analysis or "COA" is a document from an accredited laboratory that shows the number of various cannabinoids in a product.
>
> Our company sends every batch of every product made to a third (3rd) party laboratory for testing to protect our customers. Our COAs also certify that our products have as much CBD and other cannabinoids as we advertise.
>
> Once you receive your product there should be a QR code on the label that you can scan and you will be taken to a web page with the product's COA.

15

77. "The word 'defect' is not defined within the [Magnuson-Moss Warranty Act], nor is there case law explicitly interpreting the term." *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 615 (E.D. Mich. 2017) (quoting *Larsen v. Trader Joe's Co.*, No. C 11–05188 SI, 2012 WL 5458386, at *3 (N.D. Cal. June 14, 2012)).

78. In *Trader Joe's*, the Court used the dictionary definition of "defect" as "the fact of being wanting or falling short; a blemish or flaw" in its analysis. *Trader Joe's*, 2012 WL 5458386, at *3. The *Schechner* Plaintiffs updated this definition to include "a shortcoming, imperfection or lack." 237 F. Supp. 3d at 615.

79. Defendants' Products contain more than 0.3% D9 THC by weight or contain synthetic D9.

80. Defendants had a duty to disclose truth information or provide true descriptions and marketing of the Products.

81. This duty is based on Defendants' roles in the market as a retailer for this type of Product.

82. Plaintiff provided, or will provide, notice to Defendants, its agents, representatives, retailers, and their employees.

83. Defendants had previously received notice and should have been aware of these issues due to Complaints by Regulators, Lawyers, and Consumers, to its main offices.

84. The Products do not conform to its affirmations of fact and promises due to Defendants' actions and were not merchantable because they were not fit to

pass in the trade as advertised.

85. Plaintiff, and class members, would not have purchased the Products, or paid as much for the Products, if the true facts had been known; and, therefore, would not have suffered damages.

86. Plaintiff brings this action for violation of Magnusson-Moss individually, until such time 100 plaintiffs are named.

## COUNT III – NEGLIGENT MISREPRESENTATION

87. Plaintiff, individually and on behalf of the Class, incorporates by reference all preceding paragraphs against both Defendants.

88. Defendants had a duty to truthfully represent the Product and Defendants breached this duty by understating the amount of D9 THC in the product.

89. This duty is based on Defendants' position, holding themselves out as having special knowledge and experience in this area as a chain with over 150 stores.

90. Defendants' representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendants, including Vape City, a recognized and trusted brand in the State of Texas.

91. Plaintiff, and class members, reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Products.

92. Plaintiff, and class members, would not have purchased the Products,

or paid as much for the Products, if the true facts had been known; and, therefore, would not have suffered damages.

## COUNT IV - FRAUD

93. Plaintiff incorporates by reference all preceding paragraphs against both Defendants.

94. Each Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was a legal product that contained D8 THC, understood as being containing less than .3% hemp derived D9 THC by weight, instead of an illegal amount of D9 THC.

95. Each Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

## COUNT V – UNJUST ENRICHMENT/DISGORGEMENT

96. Plaintiff and the Class incorporates by reference all preceding paragraphs against both Defendants.

97. Each Defendant obtained benefits and monies by selling illegal Products to Plaintiffs and class members.

98. Each Defendant knew the Products were not as represented and expected to profit from this knowledge to the detriment and impoverishment of Plaintiff, and class members, who seek restitution and disgorgement of these illegally obtained profits.

99. The Supreme Court has held "If the new contract be fair and lawful, and the new consideration be valid and adequate, it will be enforced. If, however, it

be unfair or fraudulent, or the new consideration so inadequate as to import fraud, imposition, or undue influence, it will be rescinded, and justice done to the parties." *Dent v. Ferguson*, 132 U.S. 50, 67, 10 S. Ct. 13, 19, 33 L. Ed. 242 (1889).

100. Each Defendant knew that the transaction between Defendants and Plaintiff, as well as that of Defendants and the members of the class, were illegal transactions. Therefore, these transactions should be rescinded, a common fund should be created, and the monies restored to Plaintiff and the Class.

## **JURY DEMAND AND PRAYER FOR RELIEF**

101. Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff, Loree Perry, Individually and on Behalf of All Others Similarly Situated**,** prays for judgment:

    a. Declaring this a proper class action, certifying Plaintiff as representative, and the undersigned as counsel for the class;

    b. Entering preliminary and permanent injunctive relief by directing Defendants to correct the challenged practices to comply with the law;

    c. Injunctive relief to remove, correct, and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

    d. Awarding monetary pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

    e. Awarding costs and expenses, including reasonable attorneys'

fees for Plaintiff's attorneys and experts;

      f.      Declaratory Judgment that the products Plaintiff purchased contained more than .3% D9 THC by weight;

      g.      Declaratory Judgment that the products Plaintiff purchased contained synthetic D9 THC;

      h.      Any other and further relief as the Court deems just and proper.

      Respectfully submitted,

      WALLACE, MARTIN, DUKE & RUSSELL, PLLC  
      3800 North Lamar  
      Suite 200  
      Austin, Texas 78756  
      (512) 522-4957  
      (512) 522-4957 FAX

By:      */s/ James Monroe Scurlock*  
         James Monroe Scurlock, TBR 24077350  
         jms@wallacelawfirm.com